**CRIMORA MANGANESE CORPORATION et al. v. WILBUR, Secretary of Interior.**

No. 5184.

Court of Appeals of District of Columbia.

Submitted Oct. 9, 1930.

Decided Feb. 2, 1931.

See, also, Marshall v. Wilbur, 60 App. D. C. 59, 47 F.(2d) 421; United States ex rel. Vindicator Consolidated Gold Mining Co. v. Wilbur, 60 App. D. C. 60, 47 F.(2d) 422.

Edmund Burke and L. Q. C. Lamar, both of Washington, D. C., for appellants.

O. H. Graves and Victor H. Wallace, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and WHEAT, Chief Justice of the Supreme Court of the District of Columbia.

WHEAT, Acting Associate Justice.

This is an appeal from a judgment of the Supreme Court of the District, dismissing a petition of the appellants which sought a review, pursuant to the Act of February 13, 1929 (c. 182, 45 Stat. 1166), of the decisions of the Secretary of the Interior rejecting in whole or in part claims filed under section 5 of the Act of March 2, 1919 (c. 94, 40 Stat. 1272, 1274 [50 USCA § 80 note]), commonly called the War Minerals Relief Act. Section 5 of that act, in so far as it is material to the questions here involved, is as follows:

"Sec. 5. That the Secretary of the Interior be, and he hereby is, authorized to adjust, liquidate, and pay such net losses as have been suffered by any person, firm, or corporation, by reason of producing or pre-

paring to produce, either manganese, chrome, pyrites, or tungsten in compliance with the request or demand of the Department of the Interior, the War Industries Board, the War Trade Board, the Shipping Board, or the Emergency Fleet Corporation to supply the urgent needs of the Nation in the prosecution of the war. * * *

"The said Secretary shall make such adjustments and payments in each case as he shall determine to be just and equitable; that the decision of said Secretary shall be conclusive and final, subject to the limitation hereinafter provided. * * *

"And provided further, That said Secretary shall consider, approve, and dispose of only such claims as shall be made hereunder and filed with the Department of the Interior within three months from and after the approval of this Act: And provided further. That no claim shall be allowed or paid by said Secretary, unless it shall appear to the satisfaction of the said Secretary that the expenditures so made or obligations so incurred by the claimant were made in good faith for or upon property which contained either manganese, chrome, pyrites, or tungsten in sufficient quantities to be of commercial importance: And provided further, That no claims shall be paid unless it shall appear to the satisfaction of said Secretary that moneys were invested or obligations were incurred subsequent to April sixth, nineteen hundred and seventeen, and prior to November twelfth, nineteen hundred and eighteen, in a legitimate attempt to produce either manganese * * * for the needs of the Nation for the prosecution of the war, and that no profits of any kind shall be included in the allowance of any of said claims, and that no investment for merely speculative purposes shall be recognized in any manner by said Secretary. * * *"

By the Act of November 23, 1921 (chapter 137, 42 Stat. 322 [50 USCA § 80 note]), section 5 was amended by adding to the first paragraph thereof a proviso which need not in this case be considered.

On March 2, 1925, the Supreme Court of the United States decided that these statutes clothed the Secretary of the Interior with such discretion as to place his decision of all questions arising under them beyond review by any Court. Work v. Rives, 267 U. S. 175, 45 S. Ct. 252, 69 L. Ed. 561.

Thereafter, by the Act of February 13, 1929 (chapter 182, 45 Stat. 1166), the Act of March 2, 1919, as amended, was further amended so as to provide:

"That any claimant who has heretofore filed with the Secretary of the Interior within the time and manner provided by existing law a claim under said Acts generally known as the War Minerals Acts (Fortieth Statutes, page 1272, and its amendments) may within one year from the date of the passage and approval hereof petition the Supreme Court of the District of Columbia to review the final decision of the Secretary of the Interior upon any question of law which has arisen or which may hereafter arise in the adjustment, liquidation, and payment of his claim under said Acts, but the decision of the Secretary of the Interior on all questions of fact shall be conclusive and not subject to review by any court."

Pursuant to the last-mentioned act, the appellants presented to the Supreme Court of the District a petition to review the decisions of the Secretary of the Interior disposing of their claims. The Secretary answered the petition, and the case was submitted upon petition and answer. The court below, finding that no errors of law had been made by the Secretary, dismissed the petition on the merits, and from that judgment this appeal was taken. The petition and the answer, with the exhibits annexed thereto and made a part thereof, are very voluminous. The essential facts, however, may be reduced to a brief compass as follows:

In April, 1917, the Crimora Manganese Corporation was engaged in mining and treating manganese ores, and was the owner of 1,200 acres of land containing such ores. It had a capital stock of 10,000 shares of a par value of $100 each, and outstanding obligations amounting to $500,000, secured by mortgage on its properties. It was insolvent and without sufficient credit to comply with the alleged "stimulation" by the war-time agencies of the United States, looking toward an increased production of manganese. Its bonds were in default, and foreclosure proceedings were threatening.

On April 10, 1918, the United Chemical & Industrial Companies, a common-law trust, made an agreement with one Bennett, owner of 51 per cent. of the capital stock of the Crimora Company, pursuant to which it bought from Bennett his shares and also outstanding obligations of that company aggregating $75,600. It agreed to pay to Bennett the par value of the promissory notes in cash, and for 25 per cent. of the stock, to pay 10 per cent. thereof in cash, and 90 per cent. in negotiable notes of the United Chemical Company, and for 75 per cent. of the stock, to

give its own shares. It also agreed to increase the tonnage output of the Crimora Company, and to that end to arrange financing to produce a mining and milling output of 10 tons of wash products per day, and thereafter to increase the output to 100 tons per day. Furthermore, it agreed to purchase all the shares held by the other stockholders of the Crimora Company at the same rate at which it had purchased Bennett's shares. Eventually it acquired 89 per cent. of the stock and 80 per cent. of the bonds.

By reason of these transactions, the Crimora Company was able to organize its affairs so as to comply with the "stimulation" demand and increase its output to 100 tons daily prior to Armistice Day. In carrying out the agreement, the Chemical Company made the following expenditures:

In purchase of bonds of the Crimora Company...............$186,090.34
In purchase of stock of said Company .................. 700,000.00
In the assumption and payment of the obligations of the Crimora Company.............. 120,194.00
And in financing the Crimora Company .................. 19,222.80

On Armistice Day, it is claimed, the properties of the Crimora Manganese Company became valueless, except to the extent of $10,000, and the amounts expended by the United Chemical & Industrial Companies were therefore lost.

Answering the claim of the Crimora Company, the respondent says that, after the examination of a voluminous record, it was determined by the Secretary, as a matter of fact, that the operations and activities of the Crimora Company resulted in a total loss of $91,083.37, and no more.

Answering the claim of the United Chemical Company, the respondent contends that that company is not now, and never was, entitled, as a matter of right, to an award under the act; that it never owned or operated any properties or engaged in any activities which resulted in a loss to it through producing, or preparing to produce, manganese, or any of the metals mentioned in the act.

■ Considering first the claim of the Chemical Company, it is clear that what that company did was to buy control of the Crimora Company. The expenditures for which the Chemical Company's claim is made were incurred in purchasing the stock and bonds of the Crimora Corporation, in assuming its obligations, and, to the extent of $19,222.80, in financing its operations. Just what the term "financing" is intended to mean is not plain. It is plain, however, that no part of the expenditures for its stock and bonds went into the treasury of the Crimora Company, or were used to further its corporate purposes. The payments were made to Bennett and the other security holders, part in cash, part in the notes of the Chemical Company, and part in stock. Though we give the statute a liberal construction, the language used is not appropriate to convey the meaning that Congress intended to reimburse from the Treasury everybody who had suffered losses through buying mining securities. How the obligations of the Crimora Company were assumed and paid does not appear, but we find nothing in the act which justifies reimbursement for the payment of the pre-existing indebtedness of a mining company. Great stress is laid upon the fact that these expenditures were "stimulated," and it is alleged that the Chemical Company entered into the agreement with Bennett at the request of the war-time officials of the United States, though this is denied by the answer of the Secretary. Mere stimulation, however, does not satisfy the statute. Claims allowable under the statute must be based upon expenditures made or obligations incurred "for or upon property" containing the minerals. The claim of the Chemical Company is not of that character.

■ Turning to the claim of the Crimora Manganese Corporation, we find that that company was engaged in the production of manganese ore, and is entitled to the benefits of the act. After careful examination of its accounts and operations for the war period, the Secretary found that its net losses for that period amounted to $76,616.37, subsequently increased to $91,083.37, which was paid. Secretary Payne, in the exercise of an assumed equitable discretion, divided this award between the two claimants, and we are not now asked to pass upon his right so to do.

The statute restricts the award to be made to "net losses." To determine net losses is an accounting problem. The War Minerals Relief Commission proceeded in that manner to set up an account, items called "operations" amounting to $344,253.10 on one side, and items called "receipts and salvage" amounting to $267,636.73 on the other side. The net loss shown by the balance was $76,616.37. As already pointed out, this

was subsequently increased by an additional allowance of $14,467.

In reconsidering the claim and making this additional allowance, the Secretary said:

"The present award is made after a full consideration of the entire record of the claim of the Crimora Manganese Corporation and of the entire record of the claim of the United Chemical and Industrial Companies, and after several oral hearings held with reference to each of the claims of the said claimants."

In paragraph 35 of the respondent's answer it is alleged:

"35. Answering the entire petition so far as it relates to the Crimora Manganese Corporation the respondent says that the amount of the loss sustained by the petitioner within the terms of the act of March 2, 1919, involved a question of fact to be determined from the evidence submitted in connection with its claim under that act. The respondent says that the voluminous record of its War Minerals Claim No. 741, comprising testimony, affidavits, schedules, reports, briefs and miscellaneous papers, was completely and carefully examined and considered, with the result that it eventually was determined by the Secretary of the Interior as a matter of fact that the operations and activities of the Crimora Manganese Corporation in producing and preparing to produce manganese, within the terms of the act of March 2, 1919 had resulted in a total loss of $91,083.37, which was divided as aforesaid, and no more."

By the statute, our power to review is restricted to questions of law, and the decision of the Secretary of the Interior on all questions of fact is made conclusive. The amount of the net loss is a question of fact, and, under the well-settled principles governing hearings upon bill and answer, we are bound to hold that the allegation in paragraph 35 is conclusive, unless upon the record we can say as matter of law that the balance found was incorrect. The difficulty here is that all the items and the evidence regarding them which it would be necessary to have in order to make up a profit and loss account for the period covered are not shown, and it is therefore impossible for us to recast the account, assuming that we have power to do so.

Upon the record, it is impossible to say that $344,253.10, the amount found to be the loss, before the deductions for receipts and salvage are made, is incorrect. The only item of receipts and salvage about which the record seems to be perfectly clear and open to consideration as a question of law is that of $170,000, "Cash received from Edward E. Marshall," and that is the principal item stressed by the appellants. The facts are that prior to November 11, 1918, the Crimora Company entered into an agreement with Marshall, whereby Marshall agreed to purchase the entire output of the Crimora Company for one year. He advanced money to the company, and, on November 11, 1918, the company was indebted to him in the sum of $120,000, evidenced by promissory notes for that amount. Shortly after Marshall advised the Crimora Company that his manganese contracts had been canceled by reason of the cessation of war, and that he would refuse to receive any more manganese ore under his contract. Thereupon an agreement was made whereby the company released Marshall from his obligations under the contract; he in turn agreeing to cancel the notes for $120,000 and to pay the company $50,000 in addition.

The Secretary included this amount, $170,000, as an item of receipt and as an offset against losses. We think that was proper. It is contended that what was given by Marshall was the equivalent in value to the Crimora Company of the contract which that company held. Here again is presented the difficulty of attempting to balance an account without having before us all the items. It does not appear from the record that the contract was ever treated as an asset of the Crimora Company, or, if it was, at what figure. All that appears is that on Armistice Day the Crimora Company was indebted to Marshall on promissory notes amounting to $120,000. The settlement resulted in the cancellation of those notes and the receipt by the corporation of $50,000 in cash. As a result, the assets of the corporation were increased $50,000 and its liabilities decreased $120,000. The corporation, therefore, was better off by $170,000 than it had been before, and the loss which otherwise would have existed was diminished by that amount. It is also urged that, since the transaction took place after the armistice, it could not be considered. But the settlement related to operations during the war period. The result should therefore be treated as a part of the operations of that period. The statute does not say that no transaction subsequent to the armistice shall be considered. Losses based upon investments or obligations made or incurred prior thereto are the only losses to be paid, but, if a subsequent transaction wipes

out or curtails an apparent loss, the actual loss to be paid is only so much as remains.

█ It may be added that the petition, though replete with general allegations of "stimulation" by the "war-time agencies of the United States," nowhere names as the stimulator any one of the five agencies specified by the statute. This alone would seem to render the petition defective.

The judgment is affirmed.